**J.B. FLOYD, et al., Plaintiffs/Appellees,**

v.

**DISTRICT OF COLUMBIA, Defendant.**

**United States of America,
Defendant/Appellant**

**No. 96–5340.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1997.

Decided Nov. 7, 1997.

William Kanter, Deputy Director, U.S. Department of Justice, Washington, DC, argued the cause for appellant. With him on the briefs were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., U.S. Attorney at the time the briefs were filed, and Robert D. Kamenshine, Attorney, U.S. Department of Justice. R. Craig Lawrence, Assistant U.S. Attorney, and Charles L. Reischel, Deputy Corporation Counsel, entered appearances.

Robert E. Deso, Jr., Washington, DC, argued the cause and filed the brief for appellees.

Donald B. Ayer and James E. Gauch, Washington, DC, were on a brief for amici curiae D. Paul Sweeney and Douglas Buchholz.

John M. Ferren, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel and Lutz Alexander Prager, Asst. Deputy Corporation Counsel, filed a post-argument statement for the District of Columbia.

Before: SILBERMAN, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Retired U.S. Secret Service agents sued the District of Columbia and the United States, claiming entitlement to increased retirement benefits administered by the District of Columbia but funded by the federal government. The district court entered summary judgment for the retirees. Finding that the district court lacked jurisdiction over

the United States, we vacate the entire judgment.

## I

To combat rampant counterfeiting during the Civil War, the Department of the Treasury created the U.S. Secret Service in 1865. Not until after the assassination of President William McKinley in 1901 was the Secret Service officially assigned the task of protecting the President. Over the next seventy years, the Service's protective authority expanded as it took over various tasks from the local police. In 1930, for example, the Secret Service began protecting the White House and its grounds, a function once performed by a small force of military and District of Columbia Metropolitan Police Department officers. Congress later transferred responsibility for protecting foreign diplomatic missions from the District police to the Secret Service. *See* UNITED STATES SECRET SERVICE, DEPARTMENT OF THE TREASURY, MOMENTS IN HISTORY: 1865–1990, 4–15 (1990).

As its history suggests, the Secret Service has close ties to the D.C. police, with overlapping powers, duties, memberships, and employment benefits. *See* 3 U.S.C. § 202 (1994) ("[Secret Service] members [ ] shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia."); 3 U.S.C. § 203(b) (1994) (Secret Service Uniformed Division members may be appointed from District police ranks); 3 U.S.C. §§ 204, 206 (1994) (Secret Service members to receive the same salary, benefits, and privileges as District police officers at the same grade). Because of these historical ties, two very different pension plans cover Secret Service employees. Some agents participate in the Federal Employee Retirement System. 5 U.S.C. § 8401 *et seq.* (1994). Agents who actively perform nonclerical duties directly related to the protection of the President for more than ten years may opt into the plan governed by the District of Columbia Police and Firefighters Retirement and Disability Act ("DCRA"), 49 Stat. 358 (1935) (codified as amended at D.C.CODE ANN. § 4–601 *et seq.* (1994)). *See* D.C.CODE ANN. § 4–609. Under the DCRA, agents pay pension contributions directly into the D.C. treasury, and every month the United States reimburses the District for any shortfall between total agent contributions and total pension costs. D.C.CODE ANN. § 4–632.

The DCRA offers higher benefits than the federal system. For example, the DCRA pays benefits based on retirees' highest annual salary for any single year, while the federal program pays based on retirees' highest average salary over three consecutive years. *Compare* Letter from United States Secret Service to Thomas Farrell (Apr. 26, 1996), *with* 5 U.S.C. §§ 8401(3), 8415(a). The DCRA also contains an "equalization clause"—the subject of this litigation—that automatically increases retired agents' pensions each time active agents receive salary increases. D.C.CODE ANN.§ 4–605(a). Not only does the equalization clause assure DCRA participants the equivalent of a cost of living adjustment, but courts have interpreted the clause to trigger pension increases based on locality pay increases and collectively bargained bonuses. *See Lanier v. District of Columbia*, 871 F.Supp. 20, 22 (D.D.C. 1994); *District of Columbia v. Tarlosky*, 675 A.2d 77, 80–81 (D.C.1996). The federal retirement program contains a specific COLA provision, *see* 5 U.S.C. § 8462, but no equalization clause.

Responding to the fact that criminal investigators throughout the federal government were routinely receiving overtime pay because they routinely worked more than eight hours each day, Congress passed the Law Enforcement Availability Pay Act of 1994 ("LEAP"), Pub.L. No. 103–329, 108 Stat. 2425 (1994) (codified at 5 U.S.C. § 5545a (1994 & Supp.1996)). LEAP increased the work day of federal criminal investigators by two hours and awarded all investigators "availability pay" at the rate of 25 percent of their basic pay, thereby eliminating so-called "administratively uncontrollable overtime." *See* 5 U.S.C. §§ 5545a(c), (d). In effect, LEAP requires criminal investigators to be available for two more hours each day, in return for which they automatically receive an additional 25 percent of basic pay instead of the overtime pay they used to get.

Appellees are Secret Service criminal investigators who retired before the passage of LEAP. They contend that LEAP amounts to a 25 percent salary increase which triggers the DCRA equalization clause, entitling them to a 25 percent increase in pension benefits. When the D.C. Office of Personnel did not increase their pension benefits, the retirees sued both the District and the United States in the U.S. District Court for the District of Columbia.

Agreeing that LEAP constitutes a salary increase under the DCRA equalization clause, the district court entered summary judgment for the retirees and ordered the District and the United States to increase pension benefits by 25 percent. The United States appealed; the District of Columbia did not.

## II

■ The United States argued before the district court—although inexplicably, not before us—that the retired agents failed to identify a cause of action or waiver of sovereign immunity permitting the district court to exercise its jurisdiction over the United States. Disagreeing, the district court held that the Administrative Procedure Act, 5 U.S.C. § 702 (1994), waived sovereign immunity, treating as "final agency action" the United States' failure to grant the requested pension increase. Under the DCRA, however, it was the District of Columbia, not the United States, that did not increase appellees' pensions. *See* D.C.CODE ANN. § 4–603 (authorizing Mayor to determine pension benefits); D.C.CODE ANN. § 4–605(a) (notwithstanding § 4–603, when active members receive a salary increase, retirees are entitled to a ·commensurate pension increase "without making application therefor"). Because nothing in the record indicates that the Treasury Department, the Office of Personnel Management, or any other federal agency did or decided anything pertaining to the impact of LEAP on appellees' pensions, we asked counsel for the United States to furnish information about any and all agency actions taken in this matter. Unable to point to any such action, the United States nevertheless maintains that the district court had

jurisdiction. But jurisdiction cannot be waived and we ·have an independent obligation to assure ourselves of jurisdiction, even where the parties fail to challenge it. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) (basis for jurisdiction must "affirmatively appear in the record").

Our jurisdictional inquiry requires that we answer two questions: Did the district court have subject matter jurisdiction over the case; and does federal law authorize a cause of action against the United States, the only appellant in this appeal? Because federal removal jurisdiction would have been available under 28 U.S.C. § 1442(a)(1) had this case been filed in the Superior Court of the District of Columbia, we have no doubt that the district court had subject matter jurisdiction. *See District of· Columbia v. Merit Systems Protection Board,* 762 F.2d 129, 132 (D.C.Cir.1985) ("When federal parties remove an action under section 1442(a)(1), the federal court assumes jurisdiction over all the claims and parties in the case regardless of whether the federal court could have assumed original jurisdiction over the suit."). The district court also had federal question jurisdiction under 28 U.S.C. § 1331 because the case " 'necessarily turn[s] on some construction of federal law.' " *Merrell Dow Pharmaceuticals Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 3232, 92 L.Ed.2d 650 (1986) (quoting *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983)); *see Diven v. Amalgamated Transit Union Int'l and Local 689,* 38 F.3d 598, 600 (D.C.Cir.1994) (Congress's failure to include a certain group under a statute does not constitute an affirmative congressional decision to deny federal jurisdiction) (citing *Rogers v. Platt,* 814 F.2d 683,· 688 (D.C.Cir. 1987)).

■ Where the United States is the defendant, however, federal subject matter jurisdiction is not enough; there must also be a statutory cause of action through which Congress has waived sovereign immunity. *See United States v. Nordic Village, Inc.,* 503

U.S. 30, 34, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992). Under normal circumstances, the APA, on which the district court relied, would indeed waive sovereign immunity for a challenge to a federal agency's interpretation of a federal pay statute. *See* 5 U.S.C. § 702. But as the federal government concedes in its post-argument submission, no federal agency offered any interpretation or took any reviewable action here, nor does the DCRA expressly require the United States to take any action prior to reimbursing the District. Indeed, according to the record, the District of Columbia has not requested reimbursement from the United States, nor have the retirees ever asked the United States whether it would reimburse the District.

Although the United States claims that final agency action occurred when OPM promulgated LEAP regulations that made no reference to the DCRA, nothing in LEAP expressly requires OPM to address the DCRA. *See* 5 U.S.C. § 5545a(h)(2)(B) (LEAP to be treated as basic pay for "such other purposes as may be expressly provided for by law *or* as [OPM] *may* by regulation prescribe") (emphasis added). Moreover, not only have the retirees never challenged OPM's actions, but they take the position that the OPM regulation is irrelevant to the administration of the DCRA. Since the OPM regulation is not the object of this litigation, the fact that it fails to mention the DCRA—a statute OPM is not charged with administering—cannot be invoked at this late date to trigger APA review. *Cf. Hazardous Waste Treatment Council v. U.S. Envtl. Protection Agency,* 861 F.2d 277, 287 (D.C.Cir. 1988) (where petitioners failed to file petition seeking promulgation of regulation, court lacked jurisdiction over petitioners' claim that existing regulation was not sufficiently comprehensive).

In a post-argument filing, the District of Columbia claims that the United States makes all substantive decisions about Secret Service pensions under the DCRA and that the District serves as a mere passive conduit for federal pension monies. Although we can find nothing in the DCRA or the record explicitly limiting the District to such a passive role, we need not determine which government ultimately decides; the United States has told us that no federal official made any express decision here.

■ Without a record of federal agency action, the retirees have no APA cause of action and therefore no waiver of sovereign immunity. Nor can we find a cause of action against the United States or a waiver of its sovereign immunity in either the DCRA or LEAP. Although courts may sometimes infer a cause of action, *see California v. Sierra Club,* 451 U.S. 287, 292–93, 101 S.Ct. 1775, 1778–79, 68 L.Ed.2d 101 (1981), waivers of sovereign immunity must be unequivocally expressed in statutory text; we cannot imply a waiver of sovereign immunity, *see Lane v. Pena,* —— U.S. ——, —— – ——, 116 S.Ct. 2092, 2098–99, 135 L.Ed.2d 486 (1996). We have found nothing in the language, structure, or legislative history of either Act indicating that Congress intended the DCRA or LEAP to be privately enforced against the federal government or that Congress waived its sovereign immunity under either statute.

■ Finally, neither the District's actions nor its special constitutional status provides a basis for piercing the veil of federal sovereign immunity. The District of Columbia is still not a federal agency. *See* 5 U.S.C. § 551(1)(D) (excluding the District of Columbia from APA definition of agency); *cf.* D.C.Code Ann. § 47–391.1 (1997) (establishing District of Columbia Financial Responsibility and Management Assistance Authority). The United States does not exert sufficient control over the decisions and operations of the D.C. Office of Personnel to convert that office into a federal agency or instrumentality. *See Cannon v. United States,* 645 F.2d 1128, 1136–37 & n. 35 (D.C.Cir.1981) (Lorton Reformatory, created by federal statute and used to house federal as well as other prisoners, nevertheless is not a federal agency under Federal Tort Claims Act because Congress intended District of Columbia to control its day-to-day operations). Even where, as here, the federal government promises to pay for state-administered programs, such promises do not by themselves constitute waivers of sovereign immunity permitting

participants in those programs to sue the United States. *See United States v. Orleans,* 425 U.S. 807, 813–14, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390 (1976) (community organization that received all its funding from the federal government not a federal agency for purposes of FTCA because federal government did not supervise its day-to-day operations).

In sum, although in this case federal retirees seek federal money pursuant to a federal statute, the United States has not yet taken any action that exposes it to suit. To permit a decision on the merits, the District has asked to be substituted for the United States, but such a substitution is neither "necessary" nor appropriate since the United States has not lost its interest in the underlying matter, transferred its interest to the District, or otherwise been rendered incapable of appealing at some later date. *See* FED. R.APP. P. 43(b); *Jones v. Board of Governors of the Fed. Reserve Sys.,* 79 F.3d 1168, 1170 (D.C.Cir.1996) (organization could not be substituted for its director in order to cure standing defect); *Alabama Power Co. v. ICC,* 852 F.2d 1361, 1366–68 (D.C.Cir.1988) (non-appealing party could not be substituted for appellant where appellant was capable of proceeding with appeal).

Because parties failing to appeal are not usually entitled to the benefits of a reversal obtained by appealing co-parties, *National Ass'n of Broadcasters v. FCC,* 554 F.2d 1118, 1124 (D.C.Cir.1976), dismissing the United States would normally leave intact the district court's judgment against the District of Columbia. Under the unusual circumstances of this case, however, we think it best to vacate the district court's judgment in its entirety, as the United States has requested. The District's interests under the DCRA inextricably intertwine with those of the United States. The agents probably could not have sued the District without naming the United States as a necessary party. *See* FED.R.CIV.P. 19. Moreover, removing the United States and its purse from the case without vacating the district court's decision, thus forcing the District to make pension payments for which it is not ultimately responsible, is not only illogical and

contrary to the DCRA, but would impose a heavy financial liability on the already beleaguered city. Vacating the district court's decision in full will also give Congress, which apparently gave no consideration whatsoever to the implications of LEAP for pre-LEAP retirees covered by the DCRA, an opportunity to resolve this issue. Should Congress fail to act, the parties can return to court with a properly drawn cause of action under which a court with jurisdiction may resolve the merits of this dispute.

The judgment of the district court is vacated and the case remanded to the district court with instructions to dismiss the complaint.

*So ordered.*